## Neagley *v.* Neagley, Appellant.

*Divorce—Desertion—Separation.*

1. Although a wife may leave her husband without his consent and against his wish and without abusive treatment on his part to justify her leaving, yet, if within two years, she returns and makes an offer in sincerity and good faith to live with him, and he refuses, such separation is not such a willful and malicious desertion persisted in, without cause, for two years, as will entitle the husband to a divorce.

*Divorce—Alimony—Counsel fee.*

2. An allowance for counsel fees and expenses in favor of the respondent in the case of a proceeding in divorce by a husband against his wife, will be decreed, but in determining the amount, the ability of the libelant will be considered.

Argued Nov. 20, 1914.  Appeal, No. 244, Oct. T., 1914, by defendant, from decree of C. P. Northumber-

land Co., Sept. T., 1911, No. 122, allowing divorce in case of Jacob A. Neagley v. Mabel Neagley. Before RICE, P. J., ORLADY, HEAD, KEPHART and TREXLER, JJ. Reversed.

Libel for divorce. Before CUMMINGS, P. J.
The opinion of the Superior Court states the case.

*Errors assigned* among others were (3) in allowing alimony pendente lite and (5) allowing divorce.

*Wm. H. Hackenberg*, with him *Edwin Paul*, for appellant.—The amount allowed by the court below for alimony and counsel fees, was insufficient: Biddle v. Biddle, 50 Pa. Superior Ct. 43.

The final decree of divorce was not warranted by the evidence: Middleton v. Middleton, 187 Pa. 612; Graham v. Graham, 153 Pa. 450; Hull v. Hull, 14 Pa. Superior Ct. 520; Musgrave v. Musgrave, 185 Pa. 260; King v. King, 36 Pa. Superior Ct. 33; Olson v. Olson, 27 Pa. Superior Ct. 128; Pearce v. Pearce, 53 Pa. Superior Ct. 129; Thompson v. Thompson, 50 Pa. Superior Ct. 159; Peifer v. Peifer, 22 Pa. C. C. Rep. 593.

*Ralph L. Belford*, for appellee.—The amount allowed by the court below for alimony and counsel fees was sufficient: Edgar v. Edgar, 23 Pa. Superior Ct. 220.

The final decree of divorce was warranted by the evidence: Howe v. Howe, 16 Pa. Superior Ct. 193.

OPINION BY RICE, P. J., April 19, 1915:
The libelant and the respondent were married October 23, 1881, and have one son, aged about twenty-eight years. Between 1902 and March 24, 1909, while they lived in Milton as husband and wife, the respondent made three trips to the Pacific coast. After these trips she importuned her husband to leave his employment in Pennsylvania and go to California, because, as

she thought, opportunities there were greater, and because her health was better there. According to the preponderance of testimony she finally determined to go to the Pacific coast, whether her husband would go with her or not, and went, notwithstanding his advice to the contrary, and notwithstanding the warning he gave her that if she went she must provide for herself. True, according to the testimony of Mr. Callaghan the libelant said to her, "If you are bound to go West, you go, but I promise you I won't go with you," but when this equivocal remark is considered in connection with the other facts, it cannot fairly be interpreted as giving consent. Viewing the evidence as a whole, we think it warrants the master's finding that she left without her husband's consent. But that she left him against his wish, as stated by the master, is not so clear. On September 1, 1909, he wrote her as follows: "I sent that sewing machine this afternoon and I hope you will be satisfied now as it will be the last thing you will get from me. There is one thing sure, am having a good time and spending all the money I make. I have not seen my bed until after midnight for over three months and don't care what becomes of me. As for Elmer borrowing money from me, I don't think he will ask me as" [this part of the letter is erased] "I have to say. P. S. I will put that bill of lading in this letter and don't want to be bothered any more, and no dear to this letter as I have none there that I know of." This letter, which was the only one he wrote her, does not show that she was remaining away "against his wish," whatever may have been his wish at the time she left. It rather tends to show that he did not wish to have a restoration of marital relations.

Granting, however, that her separation from him in March, 1909, was without his consent, and against his wish, and that her contention that he had been guilty of such abusive treatment of her as to justify it is not sustained by the preponderance of testimony, this was

not sufficient to entitle him to a divorce, unless a willful and malicious desertion continued for two years at least. The law allowed her that time as a locus penitentiæ, even if she went away originally with the intention not to return: Boyd's App., 38 Pa. 241. In March, 1910, the respondent returned to Milton and went to the boarding house where her husband was domiciled. She testified: "I was sick with a very severe cold and I offered to and insisted on living with him, and in fact did stay there two days and two nights, probably a few hours longer. At that time he absolutely refused to let me stay there with him, or to live with me. . . . I said, 'Aren't you glad to see me? Won't you kiss me?' He said: 'No, I have no license to kiss a damn fool like you.'" The libelant's testimony as to this circumstance was: "She asked me to kiss her and I said no, I had no right to kiss her, that was after she said to me she didn't come to stay." "Q. Did you say you didn't propose to kiss a damn fool? A. Yes." As showing further how he greeted her when he found her in his room, we quote from his cross-examination: "Q. It suited you very well that Mrs. Schaffer wanted her to get out? A. I wouldn't have roomed with her or anything of that kind. Q. You didn't want her to stay there? A. Not at that time, no, sir. If she had done what was right later on I might have. Q. Did you ask her, when you got in, what the hell she had come back for? A. Yes, and she said she had business and she was only going to stay a week or two. Q. Did she say she came back to see if you could live with her? A. No, sir, she said she had some business and was only going to stay a week or two." We quote further from his direct testimony as to what happened when he was told that she was in his room: "I went up-stairs and told her she would have to get out of there, and she said she was sick, and I couldn't put her out, and I let her stay there that night. That was about two o'clock Friday, and Saturday morning I

went to work and noon when I came home they said she had to get out and I went up and told her, 'You'll have to get out of here, they won't keep you here, you go and get yourself a boarding place by yourself and see how you'll like it, do the same as I had to do, board by yourself.' She said she was hungry, and I said she should go and get herself a dinner but she wouldn't go unless I did. I said she should go and get herself a boarding place and told her she couldn't be put out of her own home. So she left and that's the last I saw of her then until Mr. Paul wrote me a letter and told me he wanted to see me at his office." In connection with this we quote from the respondent's testimony, omitting much of it which shows a very bitter disposition on his part towards her. "He said to me that Mrs. Schaffer wanted me to get out of there, and that he was going to move, but that he wasn't going until Saturday, and I said I could go where he went as soon as I was well enough. He said, 'You can't go where I do; I don't care where you go, but you can't go where I do.' The next day Mrs. Schaffer came up to my room and said, 'You will have to get out of here, my mother is coming. And I said, 'What difference does that make?' and she said, 'Well, she wants to sleep in this bed.' All this time they hadn't offered, neither my husband nor any of the Schaffers, to give me anything to eat, and all that I did have was some bread and butter once, that a friend of mine, Mrs. Johnston, brought me. I could not stand this treatment, so after staying there a little over two days he took my baggage out of the room and gave me a dollar and told me to go somewhere and get myself something to eat, he didn't care where. He carried my baggage downstairs for me and gave me a dollar and told me to go and get something to eat, and I went to my friend, Mrs. Johnston's. He absolutely refused to live with me. He afterwards agreed to give me $5.00 a week while I stayed in Milton, but wouldn't promise to give it to me for any length of time;

he reserved the right to discontinue giving it to me whenever he wanted to; he wouldn't live with me. He kept insisting on my going back west and repeatedly said, 'What did you come here for anyway?' I repeated the offer to live with him as his wife." The respondent is fully corroborated as to her offer to live with the libelant and as to his refusal by the testimony of Mr. Paul, her counsel, who endeavored to bring about a reconciliation between them. We remark in passing, that we see no ground for adverse criticism upon his action in testifying to the facts which came to his knowledge in the way they did. She was entitled to have that testimony. It is claimed that the respondent did not return to Milton with the intention of remaining, and that view is presented by the libelant in his testimony as being based on what she said. Reliance is also placed upon the fact that in coming from California she bought a return ticket. This latter circumstance does not seem to be entitled to very great weight. It was not an extraordinary thing to do, even if she did not intend to return to California. But the question is, not what was her intention when she left California, but what was her intention as exhibited by what she said and did when she sought out the libelant and endeavored to have him receive her again as his wife. By the great weight of the testimony we think the fact is established that she made an offer in sincerity and good faith to live with him and that he refused. Even his own testimony as to the manner in which he greeted her, and as to his repelling her affectionate advances, and, indeed, as to his entire conduct towards her, leads irresistibly to the conclusion that he desired not to live with her again as husband and wife, and that she was justified in so interpreting his words and conduct. In view of these facts there was error in awarding the decree of divorce.

The law on the subject is clear. "Desertion is an actual abandonment of marital cohabitation, with an

intent to desert, willfully and maliciously persisted in, without cause, for two years. The guilty intent is manifested when, without cause or consent, either party withdraws from the residence of the other." Ingersoll v. Ingersoll, 49 Pa. 249. This clear and concise definition has been approved in many later cases, and has not been questioned. The guilty intent to desert is rebutted where the separation is encouraged by the other party or by mutual consent. What may have been desertion in its inception, but has become a separation with mutual consent within two years, is not ground for divorce: King v. King, 36 Pa. Superior Ct. 33; Pearce v. Pearce, 53 Pa. Superior Ct. 129. The mutual consent that will prevent a divorce upon the ground of desertion may be inferred from the conduct of the parties and need not be put in the form of a solemn written agreement: Olson v. Olson, 27 Pa. Superior Ct. 128. The principle applicable to this case, whatever view be taken of the original separation, is, that the desertion must be persisted in for two full years. When the efforts of the respondent to resume marital relations are considered, how can it be said that she willfully and maliciously "persisted" in separating herself from her husband? If her efforts were sincere and bona fide, as apparently they were, the conclusion cannot be avoided that her subsequent separation from him was encouraged and consented to by him. And if it was, upon what theory can he demand a divorce except upon the theory that her original separation from him gave him justifiable cause, no matter how earnest and persistent were her efforts to end the separation? But as has been sufficiently shown, that theory is wholly untenable. It is not recognized in any case of which we are aware, and certainly not in Gordon v. Gordon, 208 Pa. 186. The principle there distinctly recognized is thus stated in 1 Bishop on Marriage, Divorce and Separation (1891), sec. 1774: "A method of breaking the desertion is by an offer to return. To be effectual, it must be made, not

for the simple purpose of defeating a legal right, but in good faith, with the intention of carrying it out in its spirit if accepted. Such an offer, tendered thus sincerely before the statutory period has elapsed, will put an end to the desertion, and bar the suit."

The third assignment of error relates to the order made for alimony pendente lite and for counsel fees. It is the uniform practice to make an allowance for counsel fees and expenses in favor of the respondent in the case of a proceeding in divorce by a husband against his wife, where the former is of sufficient ability to pay: Biddle v. Biddle, 50 Pa. Superior Ct. 43. The court recognized the rule and allowed $5.00 per month as alimony, and $25.00 for counsel fees. This, it is claimed, was inadequate and probably would be, if the value of the counsel's services were alone to be considered. But the ability of the libelant is also to be considered. In the determination of the proper amount much must be left to the sound discretion of the court below. But the allowance did not cover the services rendered by counsel on this appeal, and as to that a petition was presented to this court which was held in abeyance until the final decision. Without discussing the subject at any length, our conclusion is, taking into consideration all the circumstances and the ability of the libelant, that an additional allowance of $50.00 for expenses and counsel fees in the prosecution of this appeal should be made. In making this allowance, we take into consideration the fact that the costs of printing the paper-book will be included in the costs of the case.

A motion was made to dismiss the appeal upon the ground that the appellant had failed to comply with the requisition of the Act of June 11, 1891, P. L. 295, relative to entering into a recognizance, but that section was repealed by the subsequent act of 1897, and therefore this motion is denied. A motion was also made for a nonsuit and to suppress the appellant's paper-

book for noncompliance in some particulars with the rules of the court. Amongst the objections was that the statement of the question involved exceeded the length prescribed by the rule of the court, but this has been corrected by leave of court, and the other objections, though not to be dismissed as trifling, are not sufficient in our judgment to warrant us in dismissing this meritorious appeal and denying the appellant the right to which she is clearly entitled. See Magill's App., 59 Pa. 430. None of the irregularities in the paper-book in any way affect the appellee prejudicially.

The order relative to counsel fees and alimony is affirmed. The decree of divorce is reversed and the libel is dismissed at the costs of the libelant. It is further ordered and decreed, that, in addition to the costs, the libelant pay to the respondent or her counsel, for expenses and attorney's fees in prosecuting the appeal, the sum of $50.00.