## Chesebrough v. Chesebrough.

*Divorce—Desertion—Wilful and malicious separation.*

1. Desertion is an actual abandonment of marital cohabitation with a guilty intent to desert, wilfully and maliciously persisted in, without cause, for two years.

2. The guilty intent to desert is rebutted where the separation is encouraged by the other party or by mutual consent.

·3. What may have been desertion in its inception, but has become a separation by mutual consent within two years, is not ground for divorce.

4. The mutual consent that will prevent a divorce upon the ground of desertion may be inferred from the conduct of the parties and need not be put in the form of a solemn agreement in writing.

5. A husband will not be granted a divorce where, after his wife left him with objection on his part, he twice resumed marital relations with her within the two years after she had withdrawn from him, contributed to her support during a portion of such time and kept up a daily correspondence with her for a considerable period.

*Divorce—Residence—Jurisdiction—Domiciliary intent.*

6. The question of domiciliary intent as involving jurisdiction in divorce is always one of fact to be determined by the court or jury, as the case may be, but it turns almost wholly upon the personal intent of the party.

7. To confer jurisdiction upon the court, residence and domiciliary intent must conjoin.

8. The holding of office, engaging in business of a permanent character and the purchase of real estate with declaration of intention respecting residence are the highest evidence that can be submitted to establish domiciliary intent, but, in addition to these, all facts bearing on the intent must be considered.

9. A libellant cannot establish residence in Pennsylvania where the evidence shows that he never expressed any intention to make Pennsylvania his place of residence, although retaining a room in a hotel therein, never acquired any property therein, not even furniture, never paid any taxes or qualified to vote, and was most of his time out of the State engaged in his regular employment.

Exceptions to master's report. C. P. Schuylkill Co., July T., 1923, No. 307.

*Roscoe R. Koch* and *Henry Houck,* for libellant.

No attorney for exceptant.

BERGER, J., Nov. 2, 1925.—This is an action for divorce based on the charge of desertion, in which the master found that our court had jurisdiction, but recommended that a decree be denied on the ground that the desertion charged was not wilful and malicious. When this report of the master came before the court on exceptions filed by the libellant, the case was remanded to him for the purpose of having him take further testimony bearing on the jurisdiction of our court. The master thereupon took additional testimony, and in his supplemental report has reaffirmed his original finding that the separation was by consent of the parties, and reversed his previous finding on the question of jurisdiction. The libellant has excepted to both these findings; hence the case is now ready for final disposition.

The questions raised by the exceptions are, first, the alleged sufficiency of the evidence to establish a wilful and malicious desertion; and, second, its alleged sufficiency to confer jurisdiction upon our court. We now turn our attention to the first stated question. The libellant, on March 17, 1922, before · a magistrate in New York City, married the respondent, who was at the time a student nurse working in a hospital at New Haven, Conn. He was then employed by the J. G. White Management Corporation of New York, as an electrical engineer, to do work in connection with the East Penn Electric Company, operating in Pottsville, Pa., and at the time of his marriage lived in an apartment there at No. 356 South Centre Street, to which he returned

Chesebrough *v.* Chesebrough.

on his wedding-day, where his wife, having first returned to New Haven, Conn., joined him within a few days thereafter, and lived with him until April 19, 1922, the date of the alleged desertion. The circumstances surrounding the separation and their subsequent brief reunions, as stated in the opinion remanding the case to the master, were as follows: "His wife (the libellant's) had interrupted her training course as a nurse by marrying him and wanted to finish the course, to which he seemed to have no objection, because he endeavored to place her in the Pottsville Hospital for that purpose, but she, having been advised by Dr. Rogers, the chief surgeon there, that she could not get a certificate from that institution without taking the complete course, and that it would be better for her to complete her course at the institution where she had originally registered, returned to the West Haven Surgical and Maternity Hospital, West Haven, Conn., to resume and to complete her course of training. She told her husband of her intention to return April 18, 1922, and he requested her not to go, but she said she had come to a definite decision, was not happy in Pottsville, and nursing was 'her calling in life,' and left. Whether or not he was reconciled to her course of action before she left does not appear, but he contributed toward her support and went to New Haven in June, 1922, and stayed with her from Saturday to Tuesday morning, 'to resume our (their) relations,' and he saw her there and asked her to return to Pottsville. She had not finished training, they quarreled, and she said 'she would have nothing more to do with him,' and he returned to Pottsville. While he was at New Haven, his wife was living at the hospital, and on this visit he and his wife occupied one bed for two nights—one night at her mother's home and the other night at her sister's home. His wife later wrote to him at Pottsville that she would return, and when she returned in November, 1922, he met her at the car or train and they went to his apartment, which he had retained during her absence. She told him that she was compelled to give up her place at the hospital and that she wanted to live with him, but later said she was satisfied to return to New Haven. They stayed together in his apartment one night, but slept in separate beds. During a period of despondency occurring in the night over the loss of her position at New Haven, so he says, she took bichloride of mercury tablets, and was removed to the Pottsville Hospital at his instance on the discovery of the resultant illness in the morning, and her life was saved. While still at the hospital, her sister came on from New Haven in response to a telegram which he had sent her, and after about four days spent by his wife in the hospital, and before her full recovery, she decided to return to New Haven with her sister, although he told her she was welcome either to stay with him in Pottsville or to return to him at any time. Thereafter they appear never to have met, but maintained a correspondence, at least until Feb. 23, 1923. He kept no copies of his letters to her, nor did he testify to their substance, but he introduced in evidence three letters from his wife to him, dated Dec. 29, 1922, Jan. 25, 1923, and Feb. 23, 1923."

At the supplemental hearing before the master, the libellant testified that during the first period of his wife's absence from his home in Pottsville, or from April 19, 1922, until her return in November, 1922, they wrote to each other daily; and during her second or last period of absence from his home in Pottsville—the period commencing sometime in November, 1922, and ending with his last letter written to her in reply to the last letter he received from her on Feb. 23, 1923—he wrote his wife two or three times weekly, but her replies to his letters became less frequent than formerly and were very abusive. The libellant said that his letters to his wife did not justify the

Chesebrough *v.* Chesebrough.

replies she made to him, and that the accusations against him in the letters, which he has introduced in evidence, were unfounded and based upon false statements made to his wife by malicious persons. He also said he made frequent requests, by his letters, for his wife's return to him at Pottsville, to which she made answer by abusive statements and allusions to another party in New Haven, who would support her better than he could. All the letters which he had received from his wife, save three offered in evidence, were destroyed by the libellant before he began his proceedings for divorce. The letter said to have been received in an envelope marked "Exhibit A," post-marked New Haven, Conn., Dec. 29, 1922, is undated and bears neither saluta-tion nor subscription, and is manifestly not all of the letter which was enclosed in that envelope. It is a demand for support to the extent of $5 per week or, as an alternative, the institution by him of proceedings of divorce against his wife. The letter enclosed in envelope marked "Exhibit B," post-marked New Haven, Conn., Jan. 25, 1923, accused the libellant of having expressed a desire to marry a person called "Kit," of Pottsville, if she, his wife, divorced him, and charged him with having "skooted her (his wife) from Pottsville" in November, 1922. The last letter received by the libellant, "Exhibit C," postmarked New Haven, Conn., Feb. 23, 1923, discloses that after November, 1922, the respondent and the libellant, having failed to recon-cile their differences, each at some time contemplated bringing proceedings for divorce, and that neither thereafter wished to live with the other. The libellant also testified his wife did not have his approval at any time to leave Pottsville for the completion of her course in nursing, and that she used money saved out of his allowance made to her to go there, and that he went to New Haven to see her because he was lonesome and knew he would enjoy seeing her, and to try to come to an agreement satisfactory to both of them.

To justify a decree in this case, the burden is upon the libellant to establish by the evidence that the respondent wilfully and maliciously deserted him April 18, 1922, and that she persisted in that desertion for two full years immediately thereafter. Speaking of desertion and of separation by mutual consent, in Neagley *v.* Neagley, 59 Pa. Superior Ct. 565, 570-571, Rice, P. J., said: "The law on the subject is clear. 'Desertion is an actual abandonment of marital cohabitation with an intent to desert, wilfully and maliciously persisted in, without cause, for two years. The guilty intent is manifested when, without cause or consent, either party withdraws from the residence of the other:' Ingersoll *v.* Ingersoll, 49 Pa. 249. This clear and concise definition has been approved in many later cases and has not been questioned. The guilty intent to desert is rebutted where the separation is encouraged by the other party or by mutual consent. What may have been desertion in its inception, but has become a separation with mutual consent within two years, is not ground for divorce: King *v.* King, 36 Pa. Superior Ct. 33; Pearce *v.* Pearce, 53 Pa. Superior Ct. 129. The mutual consent that will prevent a divorce upon the ground of desertion may be inferred from the conduct of the parties and need not be put in the form of a solemn written agreement: Olson *v.* Olson, 27 Pa. Superior Ct. 128." Sternberg *v.* Sternberg, 73 Pa. Superior Ct. 328, 330, 331, and Lane *v.* Lane, 81 Pa. Superior Ct. 494, 496, 497, are to the same effect.

The respondent, wishing to complete her course in nursing, to which the libellant did not object, was obliged to leave Pottsville, to which he did object, and returned to New Haven, Conn., for the completion of her course, which was interrupted by her marriage. The libellant's objection to this separation is entirely minimized by the voluntary support of his wife during her absence

Chesebrough v. Chesebrough.

from April 19, 1922, to November of that year, and by a daily correspondence between them during that entire period. This conduct of the parties would not justify a belief in a guilty intent on the part of the wife to desert her husband, or that he had any thought that such was her intent. Moreover, the continuity of the desertion alleged to have occurred April 19, 1922, was twice broken before the filing of the libel; once on the initiative of the libellant in June, 1922, in New Haven, Conn., where he cohabited with his wife for several days, and again in November, 1922, on the initiative of the respondent, when she returned to the libellant's home in Pottsville and was received by him as his wife. If the respondent at either reunion acted in good faith and with an honest purpose to resume marital relations, then the continuity of the alleged desertion was broken. Whether she so acted is a question of fact to be determined by all the evidence, and from the evidence we reach the conclusion that she in good faith, on both occasions, intended to resume the marital relation, if it had ever been broken: Gordon v. Gordon, 208 Pa. 186; La Flamme v. La Flamme, 210 Mass. 156; 96 N. E. Repr. 62; 39 L. R. A. (N. S.) 1133.

The other exception raises the question of the jurisdiction of our court. A resumé of the libellant's testimony given at the first hearing before the master, bearing on his residence within our jurisdiction for one year immediately preceding the filing of his libel, as made in the opinion filed with the order remanding the case for further hearing, is as follows: "He (the libellant) is thirty-one years old. His father is dead and his mother has been traveling, and he testified that at the filing of the libel, June 2, 1923, and at the hearing before the master, Aug. 23, 1924, he was a citizen and resident of Pottsville, Pa., although on the latter date he was employed by the J. G. White interests in Oneonta, N. Y. Pottsville, he said, was the only settled place of abode he had ever established, although during his stay in Galveston, Tex., for a period of two and one-half years immediately prior to coming to Pottsville, he voted there and never voted elsewhere, and during his stay in Pottsville he did not register as a voter. His work with the J. G. White interests has always required him to travel about and over their various properties, and these, we know from the testimony, lie at least as far apart as Galveston, Tex., is from Oneonta, N. Y. The libel was sworn to in Pottsville, April 2, 1923, but was not filed until June 2, 1923, at which time the libellant was in Kentucky on a business trip of six weeks; but whether the business was of a private nature or in the interest of his employer, the J. G. White interests, has not been disclosed, and the period covered by the trip has not been shown. In December, 1922, the libellant gave up his apartment and took a room at No. 519 West Norwegian Street, and in May, 1923, he went on several trips and transferred 'his belongings' to the Rennas Hotel, Pottsville, Pa. He never owned any furniture, and when he traveled he always took all his clothing with him. Since the libel has been filed, his work has been traveling, largely, and he has not stayed in excess of three weeks in any one town. His permanent mailing address is Pottsville, Pa., which he calls 'home,' because most of his friends live there, and he maintains his mailing address through a post-office box in the post-office at that place, and does his banking there. He has returned to Pottsville frequently, at irregular intervals, since June 2, 1923, on an average of at least once a month, but for what purpose or where or how long he stays when he is in Pottsville has not been told." At the supplemental hearing before the master, the libellant said that he lived at Galveston, Tex., July 20, 1921, and then filled a sales position which took him into three states, with Iowa as a base, with no permanent residence until he came to Pottsville

Dec. 19, 1921. He came to Pottsville to work for the Eastern Pennsylvania Light, Heat and Power Company, under the J. G. White Management of New York, and did not work for the J. G. White Company "as such" until about Dec. 19, 1922. Thereafter, or in January, June and October of 1923, he made three trips from Pottsville to Kentucky for the J. G. White organization, in connection with their interests there. The trip in January took about three and a half weeks; and in June, about the same time; and the time covered by the October trip is not stated. The libellant corrected his previous testimony by stating that he was in Pottsville on June 2, 1923, when his libel was filed and not in Kentucky. In May, 1923, he surrendered his room at the Portz house, No. 519 West Norwegian Street, Pottsville, Pa., and went from there to New York on a business trip, evidently to Ithaca, and returned from Ithaca to Pottsville June 1st, where he remained until June 4th; he then went to Washington, D. C., on a vacation; and, thence, on a business trip for the J. G. White interests to Kentucky, covering the period from about June 15th to July 10, 1923. The libellant stored his trunk and text-books in Portz's cellar when he left there, and had them sent to himself at Ithaca, N. Y., in July, 1923, where he has a room at the Y. M. C. A. Since June 15, 1923, he was employed by the Associated Gas and Electric Company, a J. G. White managed corporation, at Ithaca, N. Y., and was paid by that company for his services.

The only fixed places of residence the libellant has had in Pottsville were at No. 356 South Centre Street, from which he moved to No. 519 West Norwegian Street, where he stored all his personal effects except his clothing, and then left in May, 1923, for Ithaca, N. Y. The Rennas Hotel, at which he has roomed whenever in Pottsville since June 1, 1923, he does not regard as his fixed place of residence, as appears by his testimony given at the supplemental hearing, as follows:

"Q. Do you maintain any fixed or established residence in Pottsville, Pennsylvania, either now or since you left Pottsville June 4, 1923? A. No. When I return to Pottsville I take a room at the Rennas Hotel. Q. When you left Mr. Portz's house in May, 1923, where did you go from there? A. I went to New York State on a business trip, returning later that same month, and went to the Rennas Hotel. Q. Did you take all of your belongings from Mr. Portz's? A. Yes. Q. When you left the Rennas Hotel, did you take all your belongings with you? A. Yes."

The burden is upon the libellant to prove the jurisdictional fact of residence within the State when his libel was filed June 2, 1923, and for at least one whole year immediately prior thereto: Heath v. Heath, 44 Pa. Superior Ct. 118, 122, 123; Harrison v. Harrison, 69 Pa. Superior Ct. 580, 582. The libellant clearly had a fixed place of abode in Pottsville from Dec. 19, 1921, until May, 1923, but that is insufficient to confer jurisdiction upon our court unless residence and domiciliary intent conjoined: Starr v. Starr, 78 Pa. Superior Ct. 579, 583; Gearing v. Gearing, 83 Pa. Superior Ct. 423, 424. The question of domiciliary intent is always one of fact to be determined by the court or jury, as the case may be, but it turns almost wholly upon the personal intent of the party: Reed v. Reed, 30 Pa. Superior Ct. 229, 235; Reed v. Reed, 59 Pa. Superior Ct. 178, 181. The cited cases show that voting in a particular place of residence is often decisive of domiciliary intent. The holding of office, engaging in business of a permanent character and the purchase of real estate with declarations of intention respecting residence are the highest evidence that can be submitted to establish domiciliary intent. Proof of domiciliary intent is not limited to the facts enumerated, but all the facts bearing

on the intent of him who seeks to establish residence, including his declarations of intent, if any, must be considered.  The libellant testified at the first hearing that he was a citizen and resident of Pottsville from Dec. 19, 1921, to June 2, 1923, but this is merely an expression of his opinion.  He never, so far as the evidence shows, expressed any intention to make Pennsylvania his place of residence; never acquired any property therein, not even furniture, and never paid any taxes or qualified to vote.  His work required him to travel widely, and wherever he went after June 1st, save his trunk and books, he took his clothing and other personal effects with him.  His purpose in going to Ithaca in May, 1923, has not been stated; but, thereafter, his permanent or principal place of employment was not in Pottsville, and it is fair to infer that if he was in Pottsville, as he testified on the supplemental hearing, he then already had accepted or contemplated the acceptance of employment at Ithaca.  Since June 1, 1923, the libellant has stopped at the Rennas Hotel whenever in Pottsville for social or business reasons, and since June 15, 1923, he has also kept a room in Ithaca, and probably one in Oneonta, N. Y.

The libellant was apprised Feb. 23, 1923, by his wife's letter to him, marked "Exhibit C," that in New York the only cause of divorce is adultery.  All the facts upon which the libellant relies for the establishment of a *bona fide* residence in Pottsville, Pennsylvania, from Dec. 19, 1921, to June 2, 1923, and since, are equally, if not more, consistent, in our opinion, with an intent to establish and hold a mere constructive residence in Pennsylvania for the purpose of obtaining a divorce than with an intent to establish a *bona fide* domicile in this State.  The importance of the marriage relation, not only to the parties, but also to the public, demands that actions of divorce be supported by clear and strict evidence, and cases are not to be disposed of on a doubtful cast of the balance, but only by such proofs as satisfy the mind of the truth of the complainant's averments: Gold v. Gold, 74 Pa. Superior Ct. 70, 72; Altwater v. Altwater, 81 Pa. Superior Ct. 359, 361.  A careful consideration of all the evidence leads us to the conclusion that neither the cause of divorce alleged nor the jurisdiction of the court has been established by the weight of the evidence.

The exceptions to the master's report are overruled and the libel is dismissed, at the cost of the libellant.

From M. M. Burke. Shenandoah. Pa.