# John J. Cahill *v.* Mary Cahill, Appellant.

*Divorce—Desertion—Evidence.*

In an action for divorce on the ground of desertion, testimony that the libellant told his wife that she could not get out too soon and that he would pay to have her furniture hauled away shows mutual consent inconsistent with wilful and malicious desertion, and a decree granting a divorce will be reversed.

Where the libellant speeds the parting the separation is consentable until one or the other destroys that status and revokes the consent by making a bona fide offer to resume marital relations, which offer is refused. An offer by libellant to resume marital relations with respondent upon conditions or promises by her to treat his children as he thought she should treat them is insufficient to change the status of consentable separation into wilful and malicious desertion.

Argued April 25, 1927. Appeal No. 115, April T., 1926, by respondent from decree of C. P. Allegheny County, October T., 1924, No. 1118, granting a divorce in the case of John J. Cahill v. Mary Cahill. Before HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ. Reversed.

Libel in divorce. Before SHAFER, P. J., MACFARLANE and DREW, JJ.

The facts are stated in the opinion of the Superior Court.

The case was referred to Charles E. Vogel, Esq., as Master, who recommended that a divorce be granted. The Court granted the divorce. Respondent appealed.

*Error assigned* was the decree of the Court.

*George S. Goldstein,* and with him *Ben Paul Brasley,* for appellant.—The separation was consentable and subsequent request for the wife's return was not sufficient to change the status: Lane v. Lane, 81 Pa. Superior Ct. 494; Reynolds v. Reynolds, 62 Pa.

Superior Ct. 280; Middleton v. Middleton, 187 Pa. 612; Crandall v. Crandall, 66 Pa. Superior Ct. 153; Pomerantz v. Pomerantz, 71 Pa. Superior Ct. 241; Ingersoll v. Ingersoll, 49 Pa. 249; King v. King, 36 Pa. Superior Ct. 33; Pearce v. Pearce, 53 Pa. Superior Ct. 129.

*Charles A. Poth,* for appellee.—The wife's departure was wilful desertion: Leonard v. Leonard, 67 Pa. Superior Ct. 412; Whelan v. Whelan, 183 Pa. 293; Golden v. Golden, 36 Pa. Superior Ct. 648; Smith v. Smith, 72 Pa. Superior Ct. 96; Mendenhall v. Mendenhall, 12 Pa. Superior Ct. 290; Sharp v. Sharp, 65 Pa. Superior Ct. 181; Murray v. Murray, 80 Pa. Superior Ct. 575.

OPINION BY GAWTHROP, J., July 8, 1927:

Libellant seeks to obtain a divorce from his wife on the ground of desertion. The master recommended a decree in his favor and the court below granted it. The wife has appealed. The parties were married June 26, 1919 and lived together until January 19, 1922. Both of them had been married before. Libellant was thirty-eight years of age at the time of the marriage and the father of six children, the youngest of whom was five and the oldest sixteen. Respondent was about the same age. After their marriage they lived at 327 Climax Street, Pittsburgh. The substance of libellant's testimony was as follows: January 19, 1922, his duties took him to a store situate two doors from the home of respondent's mother, where he saw a truck backed up to the sidewalk and recognized respondent's furniture in it. Respondent came along the street and said, "Well, I have left." He said, "Who is down there taking care of the children?" She said, "Nobody." He said, "If you were going to leave you could at least wait until I came

down there to take care of the children." She said, "There ain't nobody worrying about me." When he was asked whether he ever invited her to come back, he said that soon after she left the priest who married them "tried to fix things up and get us together again." He told the priest that he was "willing to forgive and forget everything, and try to do the best I can, if she will promise you that she will not beat up my children the way she has been beating them up." The priest talked to her and then brought her into libellant's presence and advised her to go back, but she did not agree to do it. After libellant and respondent left the parish house he said to her, "You have got to promise to not beat up them kids the way you have beat them up." She said, "Well, it would be the same thing over again, so there is no use coming back." He sent his sister-in-law, Mrs. Pfaff, "to ask her if she would come back and do what was right by the children." He did not ask her to return after the day of the interview mentioned above, but on one occasion he went to see his wife and told her that he had an opportunity to sell a piece of real estate. She said, "What do I get out of it?" "Half?" He said, "No, and if I were dead you would only get a third." She said, "What do I get out of it." He said, "A home, the same as I get out of it, that is the answer." She made no reply. On cross-examination, he testified that he and his wife had been "scrapping right along about the way she was beating the children ...... I had told my wife that I would pay for hauling her stuff if she gave me a day or two's time after she decided to go, to give me a day or two's time to get somebody there to take care of my children and she said she would go when she was damn good and ready and would tell nobody nothing"; that the trouble between them was that respondent was abusing his children; that he told her when she struck one of

the small children, "you can make up your mind to do one of two things, either treat these children fair or you can go"; that the man who moved respondent's goods came to him and told him that respondent said to go to libellant and collect for the hauling and that he paid him $5. Mrs. Pfaff testified that at libellant's request she visited respondent the day after the separation and asked her to come back, and respondent said she would not do it, because she could not get along with the children.

The substance of the testimony of respondent was as follows: Before libellant left for work on the day of the alleged desertion he said, "that he hated to see my face in that house and that if I was still there when he came back that he would break my neck, throw the furniture out and me with it ...... and he would be so damned glad to get rid of me he would even take and pay the expressman to haul my stuff out"; at different times he said, "I was nothing but a damned liar, he didn't want me around there, and that I was no good around there"; that "we don't want you around here, we don't need you"; that she got along well with him and the children when they were first married and for the first year while she was allowed to correct the children, but that after that he said he was tired of her and hated her and told her he would take charge of the children and that she "wasn't to do no correcting"; that the attitude of the children changed at that time and they became very rude, unmannerly and disobedient; that on one occasion one of the children said to her father, "Mom hit me," and he came out to the kitchen and cursed and threw her across the floor and when she was getting up he grabbed her the second time and threw her down and said, "Now I want you to get out of this house before New Year's"; that when she and her husband met at the house of the priest and the latter suggested that

they live together, she said that she was willing to go back to her husband's home, but that he made no reply; that she saw him on many occasions but he did not speak to her, except on the occasion when he came to see her for the purpose of obtaining her signature to a deed and that on that occasion he was drunk. She denied that Mrs. Pfaff ever asked her to go back to her husband. A witness, Mrs. Kehrer, testified that on the morning respondent left the home of libellant she heard the latter say to his wife that "she couldn't get out too soon, and that he would even pay for the hauling of her furniture." Another witness, Mrs Lloyd, testified that on the same occasion she heard respondent crying and heard libellant say "I don't care how soon you get out; I wish you would get out and I will even pay the expressman to haul your things away."

We are very clear that the evidence compels the conclusion that the withdrawal of respondent from libellant's residence was not only approved and encouraged but was actually consented to by him. According to his own testimony, he gave his wife the option of treating the children according to his ideas or withdrawing from his house, and each invitation which he extended to her to return had attached to it the same condition in respect to her treatment of the children. That such a separation is not a wilful and malicious desertion has been held so often that it is not necessary to cite further authority than Pomerantz v. Pomerantz, 71 Pa. Superior Ct. 241, and the cases cited therein. Guilty intent to desert is rebutted where the separation is encouraged by the other party or by mutual consent: Neagley v. Neagley, 59 Pa. Superior Ct. 565. Where the husband speeds the parting and by his acts indicates that he wishes his wife to leave him and there is a common object in both of their minds, the separation is consentable until one or the other destroys that

status and revokes the consent by making a bona fide offer to resume marital relations, which offer is refused: Lane v. Lane, 81 Pa. Superior Ct. 494; Pomerantz v. Pomerantz, supra. In the present case there is no evidence of any such offer. The only evidence touching that subject is to the effect that libellant offered to resume marital relations with respondent upon conditions or promises by her to treat his children as he thought she should treat them. That such an offer is insufficient to change a status of consentable separation into one of wilful and malicious desertion we have no doubt. Therefore, we conclude that libellant has failed wholly to meet the requirements of the law to sustain the ground for divorce averred in the libel.

The decree of the court below is reversed, the costs to be paid by the appellee.