# Lynn v. Lynn, Appellant (No. 1).

*Divorce—Jurisdiction—Residence.*

A libel in divorce which contains an averment of present residence in Philadelphia and continuous residence in Pennsylvania for upwards of eight years previous to the filing of the libel sufficiently alleges jurisdiction in the Court of Common Pleas of Philadelphia County and such facts must be proved.

*Divorce—Cruel and barbarous treatment—Indignities to the person—Evidence—Sufficiency.*

As. a cause for divorce cruel and barbarous treatment is entirely distinct from indignities to the person. A single act of cruelty may be so severe as to justify a divorce. No single indignity to the person is sufficient. Indignities need not be such as to endanger life and health, it is sufficient if they render the condition of a woman of ordinary sensibility and delicacy of feeling intolerable and her life burdensome.

Where the evidence of the libellant is adequately corroborated and the testimony of the respondent is evasive, inconclusive and lacking in frankness the Superior Court will affirm a decree of divorce which is based upon evidence of frequent assaults upon the libellant by the respondent, humiliation of the libellant in the presence of servants, relatives, physicians and others and failure to provide her with ordinary necessities including care in time of illness.

*Divorce a mensa et thoro — Alimony — Amount — Income and profits taxes—Antedating payments.*

Where a party asking alimony has produced specific evidence of the income of the respondent the burden is on the opposing party to produce specific evidence of items urged in reduction. Where the Superior Court has already ordered payment of alimony at a fixed amount "until final decree" the lower court upon entering the final decree has no authority to antedate its order for payment at a higher rate in conflict with the order of the Superior Court and a decree so made will be modified accordingly.

Argued December 14, 1920. Appeal, No. 301, Oct. T., 1920, by respondent, from decree of C. P. No. 5, Phila. Co., June T., 1916, No. 17, granting a divorce a mensa et thoro in the case of Alberta H. Lynn v. Jacob H. Lynn.

428, (1921).]    Statement of Facts—Arguments

Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ. Affirmed.

Libel in divorce. Before MARTIN, J.

The facts are stated in the opinion of the Superior Court and in the opinion upon an earlier appeal in the same case in Lynn v. Lynn, 68 Pa. Superior Ct. 324.

The case was referred to Samuel W. Salus, Esq., as master, who recommended a divorce a mensa et thoro and alimony at $13,000 annually.

On exceptions to the master's report the court sustained exceptions to the amount of alimony and reduced it to $6,000 annually, the other exceptions were dismissed and a divorce a mensa et thoro was granted. Respondent appealed.

*Error assigned* was the order of the court.

*J. Hibbs Buckman* and *W. J. Sturgis,* for appellant.— Libellant has not shown facts necessary to establish jurisdiction. While no fixed rule can be stated as to the particular kind or quantity of indignities which justify a divorce the evidence in this case does not approach the standard of the reported cases: Baker v. Baker, 195 Pa. 407; Braun v. Braun, 194 Pa. 287; Oxley v. Oxley, 191 Pa. 474; Mason v. Mason, 131 Pa. 161; May v. May, 62 Pa. 206; Sonricker v. Sonricker, 39 Pa. Superior Ct. 652; Krug v. Krug, 22 Pa. Superior Ct. 572. Alimony is limited to one-third the husband's net income: Lynn v. Lynn, 68 Pa. Superior Ct. 324.

*Francis Shunk Brown,* and with him *Thomas F. Gain,* for appellee.—The overwhelming weight of the testimony not only justifies the findings and the decree, but any other result could not be sustained. The inference against a party from failure to produce evidence within his control applies with greater force to his own failure to testify: 22 C. J. 121; Green v. Brooks, 215 Pa. 492;

Wieder v. Miller, 52 Pa. Superior Ct. 198; Wills v. Hardcastle, 19 Pa. Superior Ct. 525.

OPINION BY LINN, J., April 25, 1921:

In support of this appeal from the decree of divorce from bed and board, it is contended that (1) the common pleas of Philadelphia had no jurisdiction; (2) we should not believe the evidence for libellant because, appellant's counsel say—it is "a manufactured case which has been many years in making"; (3) the alimony granted is too large and in any event should not have been made payable for any period antedating the final decree.

Libellant charged cruel and barbarous treatment and indignities to the person. She set forth her grievances in some detail in her libel and filed a bill of particulars in response to a rule. Respondent filed an answer denying the charges and stating that "some physical conflicts were precipitated by libellant making assaults on the respondent which were repelled by him but no cruel treatment was ever inflicted on her."

1. The libel was filed April 1, 1916, and contains an averment that libellant's residence "is at No. 251 South 16th Street in" Philadelphia, "......and she has been a resident of the State of Pennsylvania continuously for upwards of eight years previous to the filing of this libel. The present residence of the respondent is Philadelphia Avenue, Langhorne, Bucks County, Pa." The parties moved from western Pennsylvania to a country home at Langhorne, Bucks County, in February, 1912. Libellant withdrew therefrom March 7, 1916, and came to Philadelphia and made her home at 251 S. 16th Street. She lived there until the rent was raised so that she "hadn't sufficient means to meet it." At the time of the hearing she lived at the Sunderland, 35th Street and Powelton Avenue. The statute requires that a libellant reside in the state "at least one whole year previous to the filing of his or her petition or libel": 13 March, 1815,

section 11; 6 Sm. L. 286. Section 2 authorizes a party to file a libel in "......the court of common pleas of the proper county where the injured party resides in term time......" It is conceded the parties resided in this Commonwealth for years immediately prior to the filing of the libel, and there is no contradiction of the evidence of libellant's residence in Philadelphia; no authority has been cited to support the proposition that she did not have such residence in this county as the statute requires; the court had jurisdiction: Mauser v. Mauser, 59 Pa. Superior Ct. 275.

2. We all agree with appellee on the controlling issues presented by the second contention.

In considering the evidence, we apply the measure of proof stated in Krug v. Krug, 22 Pa. Superior Ct. 572, 573: "The act clearly distinguishes between cruel and barbarous treatment upon the one hand, and indignities to the person upon the other, as causes for divorce, and requires that the first shall endanger life. A single act of cruelty may be so severe and with such attending circumstances of atrocity as to justify a divorce. No single act of indignity to the person is sufficient cause for a divorce; there must be such a course of conduct or continued treatment as renders the wife's condition intolerable and life burdensome. The indignities need not be such as to endanger life or health; it is sufficient if the course of treatment be of such a character as to render the condition of any woman of ordinary sensibility and delicacy of feeling intolerable and her life burdensome: Elmes v. Elmes, 9 Pa. 166; May v. May, 62 Pa. 206; Melvin v. Melvin, 130 Pa. 6; Mason v. Mason, 131 Pa. 161; Oxley v. Oxley, 191 Pa. 474. When a husband who is mentally responsible pursues such a continued course of treatment as to naturally reduce a reasonable woman to the condition defined by the statute, and thereby forces his wife to withdraw from his home, she is entitled to a divorce."

It would unnecessarily extend the length of this opinion to make detailed references to the evidence for and against the numerous charges testified about in this record of over two thousand pages, for the purpose in each instance of specifying the character of the testimony and the number of witnesses on one side or the other, or of always stating whether evidence of particular allegations was denied or not. But since it is charged that libellant presented a "manufactured case," we have examined the record in the light of that criticism and find it without any foundation whatever. In essentials the evidence of libellant is adequately corroborated to remove any doubt about the preponderance of proof; on the other hand the testimony of respondent himself, frequently impresses us as evasive, inconclusive and lacking frankness in important particulars. We must also say the suggestion that libellant's evidence lacks credibility because she testified in alimony proceedings after the approval of the master's report and before the entry of the decree, to the effect that she talked with respondent in Philadelphia shortly before and was contradicted by a number of repondent's witnesses from Uniontown who agreed in their testimony that he was in Uniontown during the entire period in which her interview with him in Philadelphia must have occurred, loses much if not all of its force by the failure of respondent to deny her testimony on that subject and by his refusal to obey a subpœna to appear for cross-examination about it.

The parties were married in 1907. She was born in 1867, he in 1872. They have no children. He is engaged in the coke business and owns coal lands in Fayette and Greene counties and for awhile lived at Uniontown. In 1911 he bought a farm near Langhorne, Pa., and after making improvements, they moved there in February, 1912. The evidence supports the conclusion that there was apparently no irreconcilable disagreement between them prior to July 20, 1912, when, as libellant says "our first trouble began." This appears to have grown out of

her refusal to execute a deed without knowing its contents of which he declined to inform her. She finally executed the deed without knowing what it conveyed.

In a letter to his father written August 1, 1913, he said, "I am distressed and humiliated again by this crazy woman I am married to......I think she is crazy beyond a doubt." She testified: "......Mr. Lynn even refused to speak to me at the table and on the 26th of September [1913] after breakfast he had the man who served breakfast tell me he wanted me. I walked out to the sun parlor and he said 'I have decided to get rid of you and this is what I will do for you' and handed me a paper"; a proposal of provisions he would make for her, received in evidence. Referring generally to the same period, counsel for appellant say, "During this time on account of divers disagreements they contemplated a mutual separation and each had employed counsel, but the matter of settlement was dropped." A draft of this proposed agreement is in the record and bears date October, 1913. We find from the evidence that respondent threatened to get rid of his wife and we attribute the cruelty of which he was guilty to his efforts to carry out that threat. We also find that its effect was to require her to withdraw from his home. In 1913 during some dispute he cursed her and because of what he said she threatened "to get up and dress myself and leave if you will write that out on a paper and sign it." He refused, whereupon she made a note of part of what he said; it was produced at the hearing but he testified that he "had no recollection of the card's being written." He admitted the dispute they then had resulted from his accusing her of having furnished information to the state taxing authorities whereby his father's taxes were increased; she denied the accusation and no basis for it was shown. Libellant also testified that later during some quarrel, the respondent referred to the occasion just mentioned when she threatened to leave and said, "That is where I made a —— damn fool of myself; I

should have left you go that time and then you would not have gotten anything." She testified that in the autumn of 1914 at breakfast in the presence of his father, respondent said "......If you don't get out I will throw you out this window." Respondent's father testified he did not hear the threat. Libellant replied to the threat by saying she would leave; she packed her trunk and thus describes what then followed: "Mr. Lynn handed me $25 and he said 'This is all the money I have for you' —sick, in poor health, facing an operation I left there with $25 and came to Philadelphia, and because I took that miserable $25—I came to Philadelphia and went to see the doctor and he told me that it would take a month's rest......" She went to her parents' home in Ohio; but returned to her husband shortly afterward, in response to a letter from him requesting her "to come to Langhorne and be operated on"; she then had a tumor removed from her leg near the ankle. Another charge was that during an altercation in the kitchen respondent threw dish water into plaintiff's face and also struck her in the face. He denied the occurrence as described by libellant, but stated that she came into the kitchen and "made some remark to me and I took the dish rag and smeared her face with dish water." Respondent's stepmother, who was present, testified that she recalled the occurrence, but she was not asked to testify concerning the details of the assault.

The evidence is conclusive that respondent assaulted libellant a number of times. On February 21, 1915, in a dispute about whether or not she had lent a cane to a rheumatic servant, he seized her by the neck and arm and kicked her repeatedly with his knee, in the struggle pushing her across the room and to the floor. This was a brutal assault and her evidence is corroborated by a number of witnesses. Two servants heard it and one of them interfered to stop it. Theresa Stearns, a nurse or maid, describes the bruised condition of libellant's body resulting from it. She also accompanied libellant to

Philadelphia on February 22d and went with her to her counsel, who wrote to respondent on her behalf complaining, among other things, that "as part of your abuse you have several times assaulted her......" Three days later she was examined by Dr. Smith who described the bruised condition of her body as he then found it. Libellant attributed her illness with acute Bright's disease to this assault. Dr. Lovett, the family physician, said he first attended libellant March 21, 1915, when she was afflicted with acute Bright's disease. He produced his record containing 129 entries of his services for libellant in that illness between March 21, 1915, and February 29, 1916.

Respondent denies these assaults. He said "I spanked her once," but could not say when; it may have been "The time she tried to hit me with a chair," but he could recall no details. He gave his weight as about 200 pounds and hers as about 140. He admitted taking from her a cane but says he neither lacerated her hand in doing so nor did he strike her with it as she testified. He admits he swore at her, called her bad names and said she was crazy; he also conceded "I have no doubt I said she lied." He testified: "Q. The only time, then, according to your present statement that you ever laid violent hands on her, was one occasion when you spanked her and you can not even tell us what year it was, is that right? A. It all happened along about the early part of 1914 I think. That's when I had the most trouble with Mrs. Lynn. "Q. When she had the most trouble with you? A. In 1915, maybe." He also testified, "She was a nuisance in every way." He deprived her of control over the household servants and refused to permit her to exercise such household supervision as ordinarily falls to a wife; he testified: "I thought it a most uncalled-for matter for a woman to interfere with the running of the house......" He humiliated her in the presence of their servants. He ordered her sister out of the house in circumstances not creditable to him. After he went to

Uniontown in 1915 her movements were reported to him by persons in the neighborhood.

He testified that about April 28, 1915, his business interests in Fayette County required him to be in Uniontown. When he left, libellant was seriously ill as already described. On or about the 15th of June, with the consent of her physician Dr. Lovett, she went to Long Island to visit a friend. After being there several days, a heart attack required immediate hospital care and she was taken to the Polyclinic Hospital, New York, under the care of Dr. Bishop. Respondent was sent for at once and came to New York and desired to take libellant away from the hospital immediately. Her physician protested that she was "in no condition to be moved." An unseemly and unnecessary dispute about expenses then took place in her room with the result as the doctor testified that libellant's "condition was becoming impaired as a result of the excitement and discussion." He then took respondent out of the room and afterwards again met him with Dr. Lovett, his family physican, who had been sent for. Dr. Lovett agreed that the patient could not be moved that day. Three days afterwards she was brought to her home at Langhorne in charge of a Polyclinic Hospital nurse; there Dr. Lovett took charge of her. Respondent was at Langhorne when she arrived, but within an hour, leaving his wife sick in bed, left for Uniontown and did not again return to live in the Langhorne home so long as libellant remained there. He did make at least one trip to Langhorne in February, 1916, and spent about an hour in the house during the day while libellant was out; he spent that night in Langhorne as the guest of a friend, although his house was open and libellant was there. When respondent left her sick in bed on April 28, 1915, and went to Uniontown to attend to his business affairs, she asked him to leave "money to run the house" and he said "You will hear from me." She testifies: "......When it came time to pay the servants I had nothing to pay them with

whatever. This Mr. and Mrs. Linton [servants] were new. Saturday night I sent three times to the post office —no money came. Theresa said 'Mrs. Lynn, you have the highest fever you have had. I am going to get Dr. Lovett.' I was forced to borrow money from Dr. Lovett, not telling him what it was for—to pay the servants."

In attempting to justify himself for leaving her in such difficult circumstances, respondent testified that "she had credit at Langhorne, at Gilliams and Linton's meat market and Showell and Fryer, Philadelphia, she could buy at Cornell, another meat man, in fact anybody would extend credit to her that took in Langhorne." But we can predicate little upon that statement because several months before he stopped her credit at a number of stores in Philadelphia and withdrew the privilege she had theretofore enjoyed of drawing checks on his bank account; his letters from Uniontown in 1915 show frequent and obviously mean criticisms of her expenditures in his absence. There is evidence that she needed clothing which she had no money to buy and borrowed from friends and relatives to get along when her husband failed to furnish necessities. He made no effort to have her come to Uniontown, and while each was doubtless willing to remain away from the other, he is responsible for his conduct. As it is unnecessary to do so, we have not here recorded all the disputes, quarrels, indignities and assaults referred to in the evidence.

3. The alimony is reasonable. The master recommended $13,000 a year and the court below reduced it to $6,000. It was made payable in monthly installments "from the 15th day of December, 1919." Appellant contends that as the decree was signed on the 15th of September, 1920, the court was without power to make the alimony at that rate retroactive to the 15th of December, 1919.

This court reviewed the order requiring the payment of counsel fees, expenses and alimony pendente lite in an opinion reported in 68 Pa. Superior Ct. 32, in which

we considered respondent's property and income up to May 1, 1916, as they appeared upon the record then before the court, showing that his income then was apparently in excess of $8,000 a year. The record now contains additional evidence on the subject into November, 1917. It is not disputed that appellant owns the coal underlying two tracts of land in Greene County, Pa., referred to in the former opinion of this court as valued by libellant at $195,730. The farm at Langhorne was sold for $20,000. He owns one-fourth of the capital stock of the Union Connellsville Coke Works, a corporation manufacturing coke from coal mined on lands belonging to respondent and his associates for rental or royalty, his interest in the land entitling him to one-fourth of the royalties; he is also an owner of stock of the Simpson Supply Company; he owns a certificate of deposit of $65,000 bearing interest at four per cent per annum and a judgment of $58,000 against J. V. Thompson. The record shows that he received income as follows in 1916 and 1917. When the accounts in evidence for 1917 closed, he had received during that year for his interest in the coal land

| | |
|---|---:|
| royalties or rents, | $ 19,126.80 |
| dividends paid by the coke corporation, | 104,250.00 |
| dividends from the Simpson Supply Company, | 500.00 |
| interest on the certificate of deposit, | 1,011.10 |
| In 1916 he received: | |
| royalties and rents, | 23,965.00 |
| dividends paid by the coke corporation, | 6,250.00 |
| dividends paid by the Simpson Supply Co., | 500.00 |
| total, | $155,602.90 |

or an average per year of $77,801.45 gross and we are advised that the sum paid as royalties in 1917 included deficits or penalties applicable to the years 1914 to 1916.

We cannot accept appellant's contention that the income paid to him by the corporation should be diminished by a part of the federal income tax and excess profits tax payable by the corporation. As the dividend was paid, we must treat it in this case as having been earned; we must likewise assume here that adequate provision was made for the payment of the federal taxes. We do not understand the theory of appellant's counsel that "If he [respondent] should return the $49,394.35 to pay his share of the company's income tax and excess profits tax, he would......" The fact is that he did not return it and so far as appears in this record there is no reason why he should do so. Where as here a party has produced specific evidence of income received, the burden is upon the opposing party to produce specific evidence of items urged in reduction of the amount clearly shown. Of course respondent must pay his own income taxes, and in disposing of this appeal, we must consider at least two other elements in the case justifying reduction in the income stated. Respondent has an admitted indebtedness of at least $43,000. The interest on that indebtedness and the retirement of the principal must be considered. It is also true as we stated in the opinion reported in 68 Superior Court Reports that as the coal is exhausted by the manufacture of coke, his receipts on that investment are not all properly to be considered as income in this inquiry, but a part must be treated as repayment of principal. We cannot however accept appellant's argument that his income for ten years should be averaged in order to get the income which should be made the basis of determining the alimony properly allowable. The style of living adopted by the parties prior to 1917 was noticed in the opinion in 68 Pa. Superior Ct., at page 328. Alimony pendente lite was fixed in that case apparently on the basis of his having an income of perhaps $8,000. We therefore see no occasion in this case to average his income for the past ten years. Considering the matter in all its aspects we

Opinion of the Court.   [76 Pa. Superior Ct.

are not prepared to say that the learned court below erred in fixing the amount at $6,000 per year. The purpose of the order is to provide support for the wife in the circumstances of the case; we have referred to her condition and necessities; we have no authority to punish the respondent in this proceeding. "The law does not contemplate that under the guise of an allowance of alimony, a portion of the estate of the husband shall be taken from him and given to his wife": Betz v. Betz, 70 Pa. Superior Ct. 396, at 404.

We must, however, modify the decree by eliminating so much thereof as makes it retroactive to December 15, 1919. On the application pendente lite, we ordered that the amount then fixed be paid "until final decree of the court below"; that final decree was made on the 15th of September, 1920, so that until that date our order prescribed the amount payable.

The decree is affirmed with the modification that the alimony is hereby made payable in monthly installments of $500 each, the first installment being computed from September 15, 1920. The costs of this appeal shall be paid by appellant.