## Cassler *v.* Cassler, Appellant.

Argued December 13, 1928.

Before HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ.

*Orrin E. Boyle,* for appellant.—The conduct of the husband justified the wife's separation from him: Neagley v. Neagley, 59 Pa. Superior Ct. 565; Reynolds v. Reynolds, 62 Pa. Superior Ct. 280; McCoy v. McCoy, 74 Pa. Superior Ct. 554; Smith v. Smith, 72 Pa. Superior Ct. 96; Breene v. Breene, 76 Pa. Superior Ct. 573; Bender v. Bender, 86 Pa. Superior Ct. 182; Hull v. Hull, 14 Superior Ct. 520; Begley v. Begley, 83 Pa. Superior Ct. 186.

*E. C. Nagle,* for appellee.—The wife was not justified in deserting her husband because he occasionally drank to excess and on one or two occasions used slight personal violence toward her: Mendenhall v. Mendenhall, 12 Pa. Superior Ct. 290; Detrick's Appeal, 117 Pa. 452; Van Dyke v. Van Dyke, 135 Pa. 459; Whelan v. Whelan, 183 Pa. 293; Bauder's Appeal, 115 Pa. 480; Murray v. Murray, 80 Pa. Superior Ct. 575.

OPINION BY LINN, J., March 1, 1929:

Desertion October 10, 1924, is averred. The parties were married in 1918. Together they conducted a small store and restaurant (a "quick lunch affair," respondent called it) in Northampton. She did the housework, opened the place early in the morning, cooked, washed the dishes, served patrons, etc. He kept the place open late at night and took charge after he came in during the morning. They got on amicably until 1920; some time during that year he began "drinking [what she called "homemade drink"] continuously for about two months" and when she remonstrated with him about it, "he got mad and came at" her, "caught" her and "hit" her and "threw [her] into the corner, tore the watch and ring off [her] and told [her] he was finished with [her];" she says she had a "black and blue arm for days" as a result of the encounter. She states that during the period he was "drinking every day and wasn't able to work or take care of business, I [she] had to attend it all." He told her "to 'get the hell out' " saying "I am not going to stop drinking, and you and no other ...... will stop me drinking, get out of here." She then complained to her husband's counsel, who told her, as she testifies, that if she couldn't live with her husband, she could leave him, whereupon she left. Her husband's counsel contradicts her, and testifies that she came to him and exhibited the marks on her arm and that he told her "she hadn't

sufficient [cause] for her to leave him and secure a support order.'' Libellant admits this assault.

After staying away about a week, she returned for some clothes, and her husband "told [her] to come back and he'd be all right.'' He then quit drinking for some time. The evidence justifies our finding that between that occurrence and October, 1924, he went on prolonged periodical sprees, during which he became very nasty. He admits those drinking spells but suggests that she exaggerates them. We accept her account of them and observe that if he expected us to adopt his statement of the facts, he should have offered evidence that was available to him, or at least, should have explained why he did not do so. She testifies that four or five times a year she had to call in Dr. Meixell of Northampton to treat libellant when in such drunken condition; as the doctor was not called by libellant to testify, we assume that he would have corroborated respondent. In these cases in which the court must make up its own mind as to the facts (Nacrelli's case, 288 Pa. 1) it is sometimes difficult to reach satisfactory conclusions, but in this case, with her testimony, his admissions concerning his drinking, and his omission to produce the physician's testimony or to explain its absence, we have no difficulty in finding the fact in accordance with her testimony and that of several other witnesses, in part, corroborating her. While such drunkenness in itself may not constitute indignities to the person of the wife rendering her condition intolerable and life burdensome, when accompanied with ill treatment and abusive language, it is a material element in a course of conduct producing that cause for divorce: Mason v. Mason, 131 Pa. 161.

In another drunken passion, libellant pushed respondent up-stairs and "hit [her] with his fist'' accompanying the assault with foul talk. Again, while drunk, he "pointed in [her] face'' a loaded revolver and said "do you want this;'' some talk ensued and

he put away the weapon; asked "Then you weren't afraid" she said, "Not exactly." After one of these occurrences she left him a second time, and remained away about two weeks. He asked her to return and she said she would if he quit getting drunk; the result was that on the advice of a friend, who was present and who testified, she returned. For a week, she states, "he was all right." Then he went on another drunk and accused her of having been "out again with" a man; she denied it and asked him to confront her with any one who said she was, but he declined to do so; she states that then he broke down and she called in Dr. Meixell to treat him. He then sobered-up and there was no difficulty until the night preceding the separation. He came home drunk and again accused her—falsely, she says—of having been out with another man. Accordingly on October 10, 1924, she left. While drunk, he called his wife opprobrious names in the presence of others; one witness said in corroborating respondent, "Well, the customers there in the store and restaurant could hear him very easily."

In October, 1924, he tried to persuade her to return; she says she agreed to return if he gave up getting into these drunken states; he says, she stated to him that she would never return, and in this, he is corroborated by his counsel who testified that one of the interviews between the parties took place in his office in October, 1924. Assuming, that in October she did say that she would never return, the law permits her to change her mind, provided she does so in time: Neagley v. Neagley, 59 Pa. Superior Ct. 565, 568. After October (and even as late as the master's hearing, to which we refer only as perhaps corroborating her previously expressed state of mind) she told him she would return if he would quit getting drunk. It was a fair condition to impose; her prior experience had shown his inability to drink moderately, and in

any event, the law prohibited his manufacture or possession of intoxicating liquors.

A study of the record convinces us that the cause of the differences between these parties was the conduct of libellant during his prolonged drunken sprees—conduct of which he was apparently not conscious after he became sober and of which he would not have been guilty while sober. In 1922 he gave her a Christmas gift of beads in a box he described as 8 by 4 inches; she was in bed; he says he "chucked them to her as you would give any one a present." She says he was drunk, came home at 2 A. M. and addressing her with an opprobrious epithet threw the box at her and struck her on the chest, leaving a "black and blue mark."

The record shows such a course of conduct on the part of libellant, persisted in from some time in 1920 to October 10, 1924, as constitutes indignities to the person of respondent rendering her condition intolerable and life burdensome within the statute: Lynn v. Lynn, 76 Pa. Superior Ct. 428, and cases cited on page 431. In such circumstances, her leaving was not desertion.

To find for libellant on this record would be to dispose of the case on a "doubtful balance of the evidence" and on "unsubstantial inferences" and this we may not do: Rommel v. Rommel, 87 Pa. Superior Ct. 511, 513.

Decree reversed; record remitted with instructions to dismiss the libel at libellant's costs.