Auerbach *v.* Auerbach, Appellant.

370

Argued October 29, 1929.

Before PORTER, P. J., TREXLER, KELLER, LINN, GAW-
THROP, CUNNINGHAM and BALDRIGE, JJ.

*Owen J. Roberts,* and with him *Paul C. Hamlin,* of
*Mesirov, Hamlin & Leonards,* for appellant.—The
domiciliary intent of libellant was not established:
Abbott v. Abbott, 75 Pa. Superior Ct. 483; Lyon v.
Lyon, 30 Pa. C. C. 342.

Libellant did not establish cruel and barbarous
treatment: Krupp v. Krupp, 95 Pa. Superior Ct. 474;
Van Guilder v. Van Guilder, 100 Conn. 1; Lynn v.
Lynn, 76 Pa. Superior Ct. 428.

Libellant did not establish indignities to the person:
Willetts v. Willetts, 96 Pa. Superior Ct. 198; Twaddell

v. Twaddell, 95 Pa. Superior Ct. 429; Rommel v. Rommel, 87 Pa. Superior Ct. 511.

*Isaac D. Levy,* and with him *Daniel G. Murphy,* for appellee, cited: Russell v. Russell, 37 Pa. Superior Ct. 348; Welfer v. Welfer, 54 Pa. Superior Ct. 215; Donnelly v. Donnelly, 76 Pa. Superior Ct. 92.

OPINION BY KELLER, J., March 12, 1930:

This was an action in divorce by a wife against her husband. The grounds charged in the libel were: (1) cruel and barbarous treatment; (2) indignities to the person. The master recommended a divorce and the court below entered a decree in conformity therewith. The parties during the entire period specified in the libel were domiciled in the State of New York. The respondent still resides there. The libellant came to Philadelphia on October 18, 1926, and one year later, to the day, signed and swore to the libel, which was filed in court October 21, 1927.

The burden is on the libellant to establish a case clearly within the statute: Deitrick v. Deitrick, 95 Pa. Superior Ct. 542, 543; a doubtful balancing of the evidence is not enough: Cassler v. Cassler, 95 Pa. Superior Ct. 445, 449. A divorce will not be granted unless the ground alleged in the libel is clearly established by the evidence: Ulizio v. Ulizio, 96 Pa. Superior Ct. 91. And it is the duty of this court to review the testimony and decide upon the merits of the case: Nacrelli v. Nacrelli, 288 Pa. 1. While the report of the master and the findings of fact of the court below must be duly considered in the light of the evidence, they do not have the same weight as the findings of a master or chancellor in equity, and we are not bound by them: Burns v. Burns, 84 Pa. Superior Ct. 489; Nacrelli v. Nacrelli, supra.

The decree in this case must rest eventually on the credence given the libellant's testimony. The corrobo-

rative evidence offered in her behalf would not support a decree in her favor. Apart from the weight of her testimony it is meager in the extreme.

(1) We may say at the outset that we find the evidence, however viewed, insufficient to sustain a decree on the ground of cruel and barbarous treatment. We said in Welfer v. Welfer, 54 Pa. Superior Ct. 215, "The cruelty which entitles a woman to a divorce is actual personal violence or the reasonable apprehension of it or such a course of treatment as endangers her life or health and renders cohabitation unsafe;" and in Krug v. Krug, 22 Pa. Superior Ct. 572, 573, "The act clearly distinguishes between cruel and barbarous treatment upon the one hand, and indignities to the person, upon the other, as causes for divorce, and requires that the first shall endanger life." Some confusion may have resulted from an excerpt defining "cruelty," in the opinion in Russell v. Russell, 37 Pa. Superior Ct. 348, pp. 353, 354; for the Supreme Court cases cited in support of the definition there given do not sustain it, but define the "cruelty which entitles a woman to a divorce" just as Judge HENDERSON did in Welfer v. Welfer, supra; his language is copied from them. And in Russell v. Russell, supra, the ground of divorce charged was not "cruel and barbarous treatment" but "indignities to the person" (See p. 349); so the opinion writer was evidently referring to the latter ground, and not to the former. The evidence fails to establish a case within the definition of "cruel and barbarous treatment."

(2) As to "indignities to the person," the case is different. Replying to the leading questions of her counsel and of the master, the libellant, in the most general terms, did give evidence, which if substantiated by particulars, and believed, would justify a divorce in her favor on that ground. It is our duty carefully to examine the evidence and determine whether it is so substantiated and is worthy of belief.

The indignities complained of by the libellant may be grouped under seven heads: (1) Constantly calling her vile names in public, as well as at home; (2) habitual drunkenness; (3) threats against her life; (4) humiliating her in public; (5) personal violence; (6) frequent expression of a desire to be divorced; (7) indignities offered her in connection with the showing of an indecent moving picture.

She testified in chief, and in her answers to the master, that respondent's abuse and indignities had begun while on their wedding trip at White Sulphur Springs, three days after their marriage, and had continued practically without let up until *he left her*—not she him—in August, 1926, three years and four months later. This testimony, though very general, was positive and emphatic. But on cross-examination she was indefinite, evasive, shifty and self-contradictory, and difficult to pin down to any definite statement to which she adhered.

(1) Taking up the grounds of complaint in the above order, she said that while on their wedding trip he started calling her "louse," "bum," "whore," "bastard" and "son of a bitch;" that he did this not only in private but publicly at the dining table and at a bridge table, where her uncle, J. C. Leeds and a Mr. Abrams were present, and continued to do so during their stay there; that he kept up this habit when they got back to New York and persisted in it almost continuously until he left her, scarcely ever addressing her any other way and calling her all these names every day. She named eight or nine other persons, friends of theirs, not relations, who heard him call her these names, besides other persons whom she could not name. Not one of these persons did she call to corroborate her in this regard, though a number were within call. The only persons whom she called as witnesses were her father and mother and a maid who lived with her for the first year and seven months of her married

life. We shall discuss the maid later. The father, who saw them three or four times a month and spent parts of the summer with them, occupying the same cottage at Deal Beach several summers, never heard him call her any of these names; the mother, who saw them even oftener, said that on one occasion while at Deal Beach she heard him use this language to her daughter while they were in their room and she was on the porch, and that two friends, (naming them), also heard him. Neither of these persons was called to testify. The mother said nothing about it to respondent at the time. Her father and mother both testified that in the winter of 1924, in consequence of their daughter's complaints to them they questioned him on the subject and he admitted having called her these names. The circumstance caused no unpleasantness between them or difference in their relations, the father saying, "I never thought about it," and the mother "I never had a cross word with him." The father's testimony on cross-examination was most indefinite and unsatisfactory. Libellant also said, without corroboration of any kind that respondent used other vile expressions to her.

(2) As to the respondent's drunkenness, her testimony was that beginning with their wedding trip he drank a great deal, frequently becoming intoxicated. Later on, "his drinking continued;" he would go out at nine o'clock in the evening and would not come home until three or four A. M., and then was intoxicated and called her vile names; that he drank heavily both at home and on summer trips and was intoxicated on such trips—at Deal, at the hotel at Jackson, N. H., and on a boat trip to Cuba; that he was drunk "a great part of the time;" "very frequently;" "he was drunk very often;" that her parents had frequently seen him drunk and, she thought, her father had remonstrated with him about it. Not one person was called to corroborate her story. Neither her father nor her mother was asked or said one word on the

subject, nor did any of her many acquaintances who must have known his habits, if habitually drunk, substantiate her testimony in one particular. Her maid, above referred to, volunteered the only corroborative statement in the evidence.

(3) Libellant testified in chief that respondent had threatened her life. The instance she gave to substantiate her statement was: "It happened one time when I had a very bad cold and wanted the window closed and he said he wanted me to get pneumonia." When she got up to close the window, he said he hoped she would fall out of it. When asked on how many occasions he threatened her life, she said, "several"; when asked whether she meant two or three occasions, she said, "approximately half a dozen." When asked what was the date of the first occasion, she said "They were everyday happenings." "They were continuously from the day we were married until we separated," and would vouchsafe no further explanation. This is a fair sample of her cross-examination. Her testimony on this item is too trivial to be noticed, except as an example of the unreliability of her evidence.

(4) She testified that the respondent humiliated her in public, and her father corroborated her in the following example of "humiliation." In July, 1926, at the Berkeley-Carteret Hotel at Asbury Park respondent left her alone at the dining table, humiliating her before the guests of the hotel. She resented his playing golf while away on their vacations. This, too, is too trivial for notice.

(5) She accused him of choking her five times so as to leave marks on her neck—wholly uncorroborated; of slapping her face once in the winter of 1924 because she asked him not to "abuse" her in public. She explained later what she meant by this abuse: "He wouldn't dance with me when we were out and he wouldn't answer me when I spoke to him" (240-a). There was no corroboration of this. She said he threw

a bottle of iodine at her which struck her on the neck and stained her flesh and clothes. Nobody saw it or its effects. She said he threw a glass at her. The maid tried to swear that she saw him do this but could not. She saw the glass lying at her mistress' feet. Libellant testified that on *one* occasion in the winter of 1924 he took her by the wrist and threw her violently on the bed in their room; that she said, "Henry, you have broken my wrist," and he replied, "That is what I wanted to do." She said her maid, Lucy Krulich, the one above referred to, could corroborate this incident, as well as his calling her vile names *every day* while she was with them. Lucy got things mixed and said she heard the respondent call libellant one of the above epithets *once,* but that the wrist incident was an *every-day* occurrence. She said: "He always grabbed her by the wrist and not only once, it was always, a habit. I thought he would break her wrists, she has such thin wrists." Q. (by master)—"What do you mean by always?" A. "Well hardly an evening passed by he didn't grab her by the wrist and throw her over." Q. "You were there how long?" A. "A year and seven months. There was hardly an evening he didn't do it." Q. "Do you mean to say that during a year and a half there was hardly an evening he didn't grab her by the wrists and almost break her wrists each time?" A. "That is when we were in the home on 83d Street, on the east side, not when we lived with her mother, but when we were home it was always like that." We put no credence in anything this maid says.

(6) She said that while on their honeymoon he had told her he had made a mistake in marrying her, that he could have had lots of very rich girls to marry. "He said that if he had no grounds for divorce, he would make it so disagreeable for me that I would leave him." He told her he hated her, and wanted her to give him a divorce; and used the most vulgar language in urging her to consent to a divorce, going so far on one oc-

casion as to express regret that she had not broken her marriage vows with a man friend who, she told him, had made an improper proposal to her.

All of these charges were denied categorically by the respondent. He testified that he had never called her the names abovementioned and had never admitted having done so to her parents; that he was not a drinking man and had not been intoxicated either in public or private, away or at home. He denied the circumstances of the open window or that he had ever threatened her life. He did admit playing golf while on his vacations. He denied having refused to dance with her and said she was the best dancer he knew; he denied ever having choked her or laid violent hands on her, or having thrown a glass or a bottle of iodine at her or having hurt her wrist or expressed a desire of doing so. He denied all her accusations relative to his desire for a divorce; said he never had such a desire and never spoke to her on the subject; that on the contrary when she refused to give up associating with a male friend who had been visiting at the same hotel in Jackson, N. H., while respondent was in New York, and who, he felt, had placed his wife in an embarrassing, if not compromising, situation, immediately prior to their separation, she had asked him for a divorce in order that she might marry this man, whom she said she loved and who, she admitted, had returned to New York the same day she did and taken her driving in his automobile a day or two following their return, and while she was not living with her husband. He said that the two attempts at reconciliation made by her uncles, the Leeds, had been suggested and brought about by him; they did not testify for libellant; that he had asked her to live with him and she had refused, saying she insisted on a divorce so that she could marry this man. He called as witnesses to corroborate him his mother and his sister, and three of his wife's most intimate friends prior to this action, who had been

frequent visitors at their home, met them often in company away from home, had spent several summers at the same places and had ample opportunity to observe respondent's conduct towards his wife; and they denied his frequent drinking or ·drunkenness, his calling her vile names, his coldness, abuse or humiliation of her, or any of the other charges open to observation by those in close contact with her, and described their married life as apparently most happy and that so far from complaining of his conduct towards her, the libellant had frequently spoken of how good he was to her; in consequence of which they were astonished when she called them by telephone and told them she had left him, and equally so when she told them she had come to Philadelphia to get a divorce.

(7) We now come to the indecent motion pictures which influenced so greatly the recommendation of the master and the decree of the court below. She testified that in the fall of 1925 while she and her husband were visiting friends of theirs named Rossbach in Philadelphia, at their apartment in the St. James Hotel, Mr. Rossbach proposed showing some moving pictures; that thinking they were pictures which Rossbach had taken of them at Deal Beach she consented and was surprised to see they were indecent pictures of nude men and women in various forms of sexual perversion; that she got up to go out and her husband said, "Don't.put on airs!" whereupon she sat down again but kept her head down. There is no doubt that Rossbach did show indecent moving pictures that evening, but libellant does not aver that the respondent knew anything about them or had anything to. do with their showing or that he was not as much surprised as she at what appeared on the screen. His story is that on their way back from a cafe, where they had dinner, Rossbach and the libellant walked ahead while he and Mrs. Rossbach followed, and when he got in Rossbach was getting the apparatus ready; that Mrs.

Rossbach said she didn't want those pictures shown but that libellant wanted to see them and insisted on their being shown. He denied telling her not to put on airs or encouraging her to stay. Libellant's attorney asked permission of the master to introduce these films in evidence and show them on a screen in the master's office, and over the objection of respondent's attorney, the picture was projected, all looking at it but the last named. The libellant identified the film; said she was sure they were the same pictures from start to finish which Rossbach had shown. Respondent denied they were the same films, but admitted that the pictures Rossbach had shown were vile and indecent, and was put through a grilling cross-examination as to his views on the propriety of showing such pictures, "for the purpose of showing his morality," counsel said. He admitted the pictures were disgusting and thought the world would be better off if seeing pictures like these, and seeing these things in life, were done away with, but said that seeing such a picture in itself did not make a man or woman decent or indecent. The examination did not exhibit the respondent in the most favorable light, but no one concerned in showing the picture or looking at it appeared to advantage from the incident. We are of opinion that the picture should not have been shown in the master's office. The respondent had not exhibited it nor been a party to it. The description given above was amply sufficient to acquaint any one with its character. Neither the court below nor this court needed an ocular demonstration of its filth to be able to judge its character and the master could have done likewise without projecting it on the screen. No good purpose was served by doing so and it ought not to have been received in evidence. Photographs are admitted in evidence to throw light on the locus in quo where a description in words is not fully adequate; but this was a collateral matter that could be explained as much as was necessary or desirable

by words, and the showing of the picture was uncalled for and unnecessary. The whole thing, deplorable as it is, exhibits the libellant in no better light than the respondent. For either she was so familiar with the picture that she could describe it in terms such that her attorney could procure it by name or number, or else she had probably had a private view of it before the projection in the master's office; it is inconceivable that her counsel would offer to show such a picture unless he was sure of her identification. Furthermore if she could identify its disgusting scenes "from start to finish," she had not kept her head down very long when it was first shown. She further testified that after the picture was shown, she went with the man who showed it to Cafe Madrid; stayed there until after midnight; came back in his company and on the way to the apartment he had proposed to her that she should go with him to a hotel in New York and occupy a room there; she admitted that despite all this she and her husband might have visited at his apartment in Philadelphia once or twice afterwards that winter and that she and her husband had subsequently entertained them in their home in New York, during which visit he again repeated the proposal. Notwithstanding which she was their guest at the Philmont Club in April, 1926, and submitted to be kissed by him while a moving picture of it was being taken.

The libellant declared that all these indignities, comprising several hundred printed pages of the record were inflicted on her wholly without cause, and not as the result of differences, and were almost a continuous succession of events from the third day of her marriage until her husband left her; that notwithstanding this almost constant abuse she loved him and had begged and implored him not to leave her. There is no doubt that during the week or ten days before the separation she sent him five telegrams, two in one day,

sending him her love, expressing her thanks for things he had sent her, telling him she was having a fine time and asking him to take good care of himself and come up when he was able; she said that notwithstanding the assertions in her libel that she had been compelled to withdraw from his house, she had not, but was anxious to continue to live with him if he had provided a home, and did not lose her love for him until four or five months after she went to Philadelphia. We think the libellant has overshot the mark; that she has sworn to too much; that a course of conduct such as she described would shortly have killed her affection for the respondent and compelled her to withdraw from him; that no woman of ordinary sensibility and delicacy of feeling could have stood such a continual course of abuse and indignity, as described by her, without her condition becoming intolerable and her life burdensome and it is inconceivable that if it were true she should have desired to continue it and begged and implored her husband to do so. We do not believe the course of conduct which she described occurred and we are convinced that her testimony is not true. We are satisfied the separation took place as the result of a quarrel following an objection on the respondent's part to her further association with a man he felt he had ground to mistrust. Rejecting her testimony on the main issues, there is, as we said at the beginning, no ground for divorce in the remaining testimony offered on her behalf.

We cannot agree with the master that the letter of respondent to his wife's parents written in August, 1924, thanking them for a generous check as a birthday present, was an acknowledgment that he had previously mistreated his wife. The letter, on the contrary, evidences a warm affection for her, and his statement, that the only way he could show his appreciation was "by being good and making dear Bertha happy," does not appear to us as any admis-

sion of misconduct as respects her; nor do the other phrases referred to by the master. And we do not attach any importance—as the master did—to the fact that in one instance in the course of respondent's testimony, "he made it appear as though the libellant was addressed by a very intimate friend of hers as Mrs. Auerbach." It was a natural slip in relating an incident to third persons. The libellant did precisely the same thing on p. 195-a, without affecting the master's good opinion of her evidence, when in telling of a complaint she had made to her father she was asked what she had said, and replied, "I said *Mr. Auerbach* spoke this way to me."

The examination by her counsel, tending to show that her friend Mrs. Rosener, who testified as a witness for respondent, was so testifying because she had left her husband and expected to marry respondent, and his argument to the same effect in court, overlooked the apparent inconsistency that by so testifying she was doing everything possible to prevent such a marriage; that she could not marry the man unless they were *both* divorced.

We might stop here. But if her testimony on the main issue is not worthy of belief, we are all satisfied that her residence in Philadelphia is not bona fide, but was adopted solely to obtain a divorce in Pennsylvania. If so, she acquired no domicil in Pennsylvania and cannot sue for a divorce in this State: American Law Institute, Conflict of Laws Restatement, Tentative Draft No. 1, sec. 24 (e), and cases cited.

We have no desire further to prolong an opinion already too long. We believe the following to be a correct statement of the actual facts. Knowing that a divorce can be had in New York only on the ground of adultery, she consulted Max D. Steuer, a celebrated New York lawyer, who, she said, was her father's attorney and whom, the latter said, he never saw; that

on his recommendation she consulted a well known lawyer in Philadelphia, who is no longer in the case, and solely for the purpose of securing a divorce under the laws of Pennsylvania came to Philadelphia, and took a two years' lease on an apartment in the Warwick Hotel, to give plausibility to her claim of residence; that she notified her friends in New York and her Philadelphia friends at Deal Beach that she had separated from her husband, and when she came to Philadelphia told them that she had come to get a divorce; her story that she came to Philadelphia because she was embarrassed at her friends in New York knowing of her estrangement from her husband is not consistent with her admission that she herself told her friends of her separation. She had no relatives and no business to draw her to Philadelphia and if she had many friends there, her living apart from her husband in a city not his home would be likely to cause more talk than residing with her parents. She opened a bank account in Philadelphia, but an examination of it shows that from its opening to September 25, 1928, a few days less than two years, she deposited in her Philadelphia bank account only $700 more than the $6,800 needed for her room rent. She kept her account in the Guaranty Trust Co., New York, open until September, 1928, in spite of her bald denial when first cross-examined on the subject, and her safe deposit box in that city in which her valuables were kept. She preserved 47 circulars with their envelopes, which were addressed to her at Philadelphia, apparently for the purpose of showing a residence there. She was not registered as a voter until September, 1928, after the respondent had disputed the bona fides of her residence in his answer, and so far as the record shows she never made a return of personal property at interest or paid a tax on the same, though she did file income tax returns in Philadelphia.

She undoubtedly spent some considerable time in Philadelphia and met many people, but she also spent much time at her parents' home in New York. The manager of the Warwick Hotel, testifying on her behalf, said that a record was kept of the exact number of days guests were actually present in the hotel but she did not produce it. She had no charge accounts in Philadelphia except one small charge at Bailey, Banks & Biddle's for the repair of a small piece of jewelry for an uncle. She made most of her purchases in New York, had them sent to her mother's home and charged to her mother or herself—which is not clear. She swore to her libel for divorce one year to the day after she came to Philadelphia.

There are many other inconsistencies which could be pointed out but we have enough. We are convinced she had no thought or purpose in coming into Pennsylvania but to get a divorce under our laws that she could not get in the courts of her domicil.

On both grounds, lack of bona fide residence and failure to establish clearly a case entitling her to a divorce, we feel the decree must be reversed.

All of the ten assignments of error are sustained. The decree is reversed and the record is remitted with directions to enter a decree dismissing the libel.